UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| MARY PROFFITT, : | |
| : | |
| Plaintiff, : | Case No. 3:24-cv-32 |
| : | |
| v. : | Judge Thomas M. Rose |
| : | |
| NORTHEASTERN LOCAL SCHOOL : | |
| DISTRICT BOARD OF EDUCATION, : | |
| : | |
| Defendant. : | |
| : | |
| : | |

**ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART,
MOTION FOR SUMMARY JUDGMENT (DOC. NO. 20)**

Currently before the Court is the Motion for Summary Judgment (the "Motion") (Doc. No. 20) filed by Defendant Northeastern Local School District Board of Education (the "District") on April 10, 2025.  Plaintiff Mary Proffitt ("Proffitt") has brought suit against her former employer, the District, claiming that the District interfered with her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA").  (Doc. No. 1 at PageID 4.)  Additionally, Proffitt alleges that, during her employment, the District subjected her to discrimination on the basis of her disabilities, in violation of Ohio law and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").  (Doc. No. 1 at PageID 4-6.)  On summary judgment, the District submits that Proffitt's job performance was so poor that she would have been terminated from her position whether she exercised her FMLA rights or not.  (Doc. No. 20 at PageID 830.)  Moreover, the District contends that even if Proffitt can make out a *prima facie* showing of disability discrimination, she cannot prove the District's legitimate reasons for firing her were pretextual, as

1

she must by virtue of the Supreme Court's holding in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (*Id.* at PageID 828-35.)

For the reasons set forth herein, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, the District's Motion.

I. **BACKGROUND**

Proffitt worked either with or for the District from 2019 through 2023. (*See* Doc. No. 13 at PageID 260-61, 328.) Proffitt was contracted out as an aide to several of the District's special needs students during the 2019-2020 and 2020-2021 school years. (*Id.* at PageID 260-61.) Prior to the start of the 2021-2022 school year, the District began looking to hire a new behavioral specialist, a district-wide administrative position, tasked with providing direct and consultative services for special education classes within the District. (Doc. Nos. 13 at PageID 261-62; 20-2 at PageID 838-40.) At the time, Proffitt did not have the necessary college education to be considered for the position.[1] (Doc. No. 13 at PageID 262.) However, the District's sitting special education supervisor, Robyn Callicoat ("Callicoat"), had worked with Proffitt in her capacity as an aide and recommended her for the behavioral specialist position. (Doc. Nos. 13 at PageID 262-63; 16 at PageID 603.) The District's director of pupil personnel, Steve Linson ("Linson"), agreed and Proffitt was hired under a limited two-year contract. (Doc. Nos. 13 at PageID 263, 271; 20-1 at PageID 837.)

In her first year as a behavioral specialist, Linson gave Proffitt a largely positive evaluation, with some development needed in job functions like communicating with colleagues and meeting deadlines. (*See* Doc. No. 13-7.) Linson confirmed this assessment at his deposition, testifying that in the 2021-2022 school year he believed Proffitt exhibited various strengths despite her lack

---

[1] Proffitt subsequently earned her bachelor's degree in psychology in the Summer of 2022. (Doc. No. 13 at PageID 255.)

2

of experience and credentials, but that Proffitt certainly showed a need for improvement in collaborating with her colleagues and completing tasks in a timely manner. (Doc. No. 17 at PageID 680-81.)

By all accounts, Proffitt's 2022-2023 school year as a behavioral specialist did not go as swimmingly. Proffitt recalls that as early as September 2022 she was having trouble doing her job because her colleagues, along with Linson, were excluding her from meetings and withholding student data from her. (Doc. No. 13 at PageID 300-04.) She allegedly informed Linson and her other superiors of the anxiety she was suffering as a result of this exclusion. (*Id.* at PageID 303-04.) Proffitt did not, however, apprise her superiors of any pre-existing mental health conditions being exacerbated by this dynamic. (*Id.*) For his part, Linson was receiving complaints about Proffitt from District faculty and parents of students with special needs throughout the 2022-2023 school year. (Doc. Nos. 15 at PageID 553-54; 17 at PageID 690-92, 694; 17-1 at PageID 725; 17-3 at PageID 729.) In response to some of these complaints, Linson placed Proffitt on a performance improvement plan in November of 2022. (Doc. No. 17-8 at PageID 760-62.)

Also in late Fall of 2022, Linson started compiling a living document to record complaints about Proffitt as they came to him. (Doc. No. 17 at PageID 694-95; *see also* Doc. No. 17-7.) Callicoat was one of the chief complainants, even writing her own section in Linson's document. (Doc. No. 16 at PageID 619-20.)

Tensions between Proffitt and Callicoat came to a head in February of 2023. (Doc. Nos. 13 at PageID 273-74; 16 at PageID 613-14.) On February 21, 2023, Callicoat called a meeting between herself, Proffitt, and a teacher to discuss Proffitt's improper administration of a student's behavior plan and assessments. (Doc. No. 16 at PageID 613.) At that point, Proffitt describes Callicoat mercilessly berating her, which triggered a trauma response and caused Proffitt to freeze

3

up. (Doc. No. 13 at PageID 279-81.) For context, Proffitt claims to suffer from ADHD, anxiety, depression, and PTSD, though it is not clear that she ever explicitly told anyone she worked with as much during her time with the District. (*Id.* at PageID 274.) Callicoat describes the confrontation between her and Proffitt on February 21 as a "spirited conversation," where both women raised their voices at one another. (Doc. No. 16 at PageID 615.) Proffitt acknowledges that she was conscious enough to stick up for herself at the meeting. (Doc. No. 13 at PageID 282-83.)

The next day, Proffitt emailed Linson to report the incident between her and Callicoat. (Doc. No. 13-4 at PageID 400.) Proffitt told Linson that Callicoat had screamed and cursed at her, and, while this was not the first time Callicoat behaved this way toward her, it was the most egregious. (*Id.*) Proffitt went on to claim that the treatment she suffered at the hands of Callicoat was causing her unnecessary stress. (*Id.*) Getting to the heart of the matter, Proffitt basically accused Callicoat of bullying her. (*Id.*) Linson then referred Proffitt's allegations to an investigator to determine whether Callicoat had violated the District's policy against harassment, intimidation, and bullying. (Doc. No. 13-4 at PageID 400; *see also* Doc. Nos. 17-10, 17-11.) The District concluded its investigation of Proffitt's claim on May 10, 2023, ultimately finding no verifiable wrongdoing by Callicoat. (Doc. No. 13-15 at PageID 450.) This determination was made after Proffitt failed to respond to the District investigator's inquiries. (*Id.* at PageID 451.)

In the days following her email to Linson, Proffitt applied and was approved for leave under the FMLA. (*See* Doc. No. 13-13.) Experiencing the flu-like symptoms of headaches, nausea, and vomiting, Proffitt was slated to be on FMLA leave from March 1, 2023, through March 9, 2023. (*Id.* at PageID 455.) On March 8, 2023, Proffitt's period of FMLA leave was extended

through April 20, 2023, when a mental health professional submitted a letter to the District, which read:

> It is my clinical opinion that Mary Proffitt should remain out of work until 4/21/23, per previously submitted FMLA paperwork.

(Doc. No. 20-7 at PageID 848.)

By mid-March 2023, once it was apparent that Proffitt would not be returning from FMLA leave before the end of the school year, Linson prepared Proffitt's final administrative evaluation for the 2022-2023 school year using the data he had collected in the preceding months. (*See* Doc. No. 17-8.) That evaluation indicates Proffitt was either developing or otherwise ineffective in half of all the metrics she was judged by for the school year. (*Id.* at PageID 748-51.) Linson states that Proffitt's final evaluation was based strictly on her job performance before going on leave. (Doc. No. 17 at PageID 698.) Notably, Linson admits that Proffitt's use of FMLA leave prevented her from fully progressing with her performance improvement plan for the 2022-2023 school year. (*Id.* at PageID 698, 701.) In concluding Proffitt's evaluation, Linson recommended that the District not renew Proffitt's contract for the 2023-2024 school year. (*Id.* at PageID 759.) The District concurred and adopted a resolution not to renew Proffitt's employment contract on May 18, 2023. (Doc. No. 20-5 at PageID 845.)

Proffitt filed her Complaint (Doc. No. 1) in this case on February 6, 2024. Broadly, Proffitt has set out three counts against the District for violation of the FMLA (Count I), disability discrimination in violation of Ohio law (Count II), and disability discrimination in violation of the ADA (Count III). (Doc. No. 1 at PageID 4-6.) Proffitt has pled these counts in a manner that resembles a sort of "shotgun pleading," so the Court cannot easily discern the particular causes of action at issue here. (*See id.*) Nevertheless, the Court reads the text of Proffitt's Complaint to allege causes of action for FMLA interference, disparate treatment on the basis of disability, in

5

violation of state and federal law, and disability discrimination by retaliation, in violation of state and federal law.

The District submitted its present Motion on April 10, 2025. (Doc. No. 20.) Proffitt responded on April 30, 2025 (Doc. No. 33), and the District filed its reply brief on May 14, 2025 (Doc. No. 34). The Court now considers the District's Motion ripe for review and decision.

## II. **STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c).

The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id*. at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the

6

[unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. Instead, "the nonmoving party 'must present significant probative evidence' putting material facts in doubt." *Walden v. Gen. Elec. Int'l, Inc.* 119 F.4th 1049, 1057 (6th Cir. 2024) (quoting *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 526 (6th Cir. 2023)). The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

As an initial matter, the Court finds it necessary to explain its reading of Proffitt's Complaint. As far as her FMLA claim is concerned, the language of Proffitt's Complaint and her arguments made in response to the District's Motion reflect allegations of FMLA interference. (*See* Doc. No. 1 at PageID 4; *see also*, Doc. No. 33 at PageID 1082-86.) In particular, Proffitt has alleged that her use of FMLA leave was a negative factor in the decision to not renew her employment contract. (Doc. No. 1 at PageID 4.) As the Court explains below, this allegation, while conclusory, states the measure of causation under a theory of FMLA interference. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007). The District's arguments related to FMLA retaliation are for naught. Next, Proffitt has alleged causes of action under state and federal law for disability discrimination by way of disparate treatment. (*See* Doc. No. 1 at PageID 4-6.) Finally, within her claims of disability discrimination, Proffitt has alleged disability discrimination by way of retaliation. (*See* Doc. No. 1 at PageID 4-5.) In her response to the District's Motion, Proffitt does not argue retaliation, but instead argues a claim for failure to reasonably accommodate her disability. (*See* Doc. No. 33 at PageID 1086.) Yet, Proffitt has not pled the same in her Complaint. Proffitt's Complaint very clearly states, "Defendant unlawfully acted in retaliation for Plaintiff's use of the reasonable accommodation of leave." (Doc. No. 1 at PageID 5.) That allegation leads the Court to believe that Proffitt has alleged ADA retaliation. Proffitt has simply made no other allegations respecting reasonable accommodations to suggest otherwise.

Practically speaking then, the Court can dispose of the District's Motion in two broad parts. First, the Court considers the viability of Proffitt's claim for FMLA interference. The remainder of Proffitt's causes of action—disability discrimination and ADA retaliation—must be analyzed

under the burden-shifting framework of *McDonnell Douglas Corp.*, 411 U.S. 792 (1973). The Court assesses Proffitt's claims accordingly

### a. **FMLA Interference**

Again, in attacking Proffitt's FMLA allegations, the District does not expressly argue against Proffitt's claim for FMLA interference. Rather, the District implicitly challenges this cause of action by insinuating that Proffitt's employment contract would not have been renewed regardless of whether she went on extended FMLA leave at the close of the 2022-2023 school year. (*See* Doc. No. 20 at PageID 827.) In pertinent part, Proffitt argues *contra* that her FMLA leave was impermissibly used as a negative factor in the decision to not renew her contract for the 2023-2024 school year. (Doc. No. 33 at PageID 1085-86.) Proffitt has the right of it for the purposes of the instant Motion.

Fundamentally, "[t]he FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if … an employee has a serious health condition that makes the employee unable to perform the functions" of their position. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (quoting *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)) (internal quotation marks omitted). Further safeguarding employees' FMLA rights, the FMLA also entitles qualifying employees "to be reinstated to their previous position, or 'to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment,'" so long as they return to work within twelve weeks. *Edgar*, 443 F.3d at 506 (quoting 29 U.S.C. § 2614(a)(1)). Because employee protections under the FMLA are characterized as rights, an employer's failure to honor those rights in contravention of the FMLA will give rise to an entitlement theory of liability. *Edgar*, 443 F.3d at 507. This "entitlement theory" has been more commonly dubbed, the theory of FMLA interference. *Id.*

When faced with a claim of FMLA interference, "'[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA ….'" *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (quoting *Hodgens v. gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)). To that end, in order for a plaintiff's interference theory to succeed, she must prove that: "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Edgar*, 443 F.3d at 507 (citing *Walton*, 424 F.3d at 485).

The only element of the FMLA interference test plausibly in dispute in this matter is the fifth—whether the District denied Proffitt FMLA benefits to which she was entitled. Such a denial need not come as the result of an employer's nefarious intent. *Edgar*, 443 F.3d at 507 (citing *Arban*, 345 F.3d at 401) ("The employer's intent is not a relevant part of the entitlement inquiry under [29 U.S.C.] § 2615"). However, a plaintiff arguing that her FMLA benefits were wrongly denied her must still establish that the use of leave caused her to suffer an adverse employment action. *See Wysong*, 503 F.3d at 448. Causation will ultimately be demonstrated where "an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave …." *Id.* at 447. In other words, "'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" *Wysong*, 503 F.3d at 447 (quoting *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 422 (6th Cir. 2004); *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003)).

On the record currently before it, the Court cannot reasonably find that Proffitt's use of FMLA leave in the Spring semester of 2023 was not a negative factor in the non-renewal of her employment contract. The Court's consideration here begins and ends with Linson's own

10

admissions. At his deposition, Linson stated that he recommended Proffitt for non-renewal based on her performance before going on FMLA leave. (Doc. No. 17 at PageID 698.) He also admitted that Proffitt was on a performance improvement plan she never had the opportunity to complete because she went on extended leave. (*Id.* at PageID 701.) In a roundabout way, Linson has satisfied Proffitt's burden for her. Proffitt was counseled and given a plan of action to improve her job performance before being subject to non-renewal. When Linson says that he could not assess Proffitt's improvement in full under this plan because she was out on leave, he is saying that Proffitt could do nothing to satisfy her performance improvement plan within the time allowed and have her contract renewed because she took FMLA-protected leave. While there is no evidence that Linson acted maliciously in this regard, his testimony necessarily implies that Proffitt's use of FMLA leave contributed to the decision to not renew her employment.

To be clear, whether Proffitt's employment contract would have been subject to non-renewal even if she had not exercised her FMLA rights would seem a conjectural inquiry. Yet, it is also an issue of fact to be resolved by a jury. For the time being, Proffitt can establish the elements of her FMLA interference claim on summary judgment. Thus, the Court **DENIES** the District's Motion with respect to Proffitt's claim for FMLA interference.

### b. Disability Discrimination

When a plaintiff relies on circumstantial evidence to prove her claim of disability discrimination, as Proffitt does here, that claim must be tested against the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp.*, 411 U.S. at 802-04 (1973). *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)). Under Ohio law, anti-discrimination claims generally get the same treatment as federal claims and courts tend to analyze plaintiffs'

11

allegations of disability discrimination under state and federal law in tandem. *See generally Plumbers & Steamfitters Joint Apprenticeship Comm'n. v. Ohio Civ. Rights Comm'n.*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1043-46 (6th Cir. 2014).

Pursuant to *McDonnell Douglas* the "plaintiff has the initial burden of demonstrating" the elements of her claim. *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 727 (6th Cir. 2007). The plaintiff must first establish a *prima facie* case of discrimination. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). If the plaintiff succeeds, then "the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the termination." *Sullivan v. Coca-Cola Bottling Co.*, 182 F. App'x. 473, 477 (6th Cir. 2006) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the employer does so, then the burden shifts back to the plaintiff to prove "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Sullivan*, 182 F. App'x. at 477 (quoting *Burdine*, 450 U.S. at 253)). "Throughout the analysis, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Sullivan*, 182 F. App'x. at 477 (quoting *Burdine*, 450 U.S. at 253).

The Court applies these principles to Proffitt's claims related to disability discrimination in turn.

### 1. Disparate Treatment – *Prima Facie Case*

By its Motion, the District contends that Proffitt cannot demonstrate a *prima facie* case of disability discrimination here because Proffitt was not qualified for the behavioral specialist position she was awarded in the first place. (Doc. No. 20 at PageID 834.) The District appears to mount no further challenge to Proffitt's ability to satisfy her *prima facie* burden for disability discrimination.

To set forth a *prima facie* case of disability discrimination in the employment context, a plaintiff must prove: "(1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open." *Bledsoe v. Tenn. Valley Auth. Bd. of Directors*, 42 F.4th 568, 578 (6th Cir. 2022) (quoting *Jones v. Potter*, 488 F.3d 397, 403-04 (6th Cir. 2007)) (internal quotation marks omitted). Regarding the requirement that the plaintiff be otherwise qualified for the position at issue, "the employer's judgment will not be dispositive on whether a function is essential when evidence on the issue is 'mixed.'" *Rorrer*, 643 F.3d at 1039 (citing *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012); *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013)). Moreover, "[w]ritten job descriptions are also not dispositive." *Id.*

Again, the District does not challenge Proffitt's ability to satisfy four of the five elements at play in this regard. For the sake of brevity, the Court assumes that Proffitt can do so and focuses its attention on Proffitt's qualification for the behavioral specialist position with the District.

At the summary judgment stage, the Court finds that Proffitt has done plenty to prove she was otherwise qualified for the behavioral specialist position. That Proffitt did not have the academic credentials sought in the District's job listing at the time of her hiring is relatively inconsequential. District officials hired Proffitt as a behavioral specialist despite her academic background because she had proven reliable as an aide in prior school years. Additionally, Linson testified that his first evaluation for Proffitt showed her definitive strengths in the role even though she did not yet have a college degree. Indeed, the District took no corrective action against Proffitt until after she received her bachelor's degree in the Summer of 2022. Viewing these facts in

13

Proffitt's favor, the evidence pertaining to Proffitt's qualifications is, at best, mixed. At worst, the District only began to question Proffitt's qualifications when she started to show symptoms of her alleged disability. Accordingly, the Court finds that Proffitt can sufficiently establish a *prima facie* case of disability discrimination here.

## 2. ADA Retaliation – *Prima Facie Case*

Turning to Proffitt's claim for ADA retaliation, the District contends that Proffitt cannot prove a causal link between the exercise of her rights under the ADA and the District's decision to not renew her employment contract. A claim for ADA retaliation "requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer*, 743 F.3d at 1046 (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)). For perspective, the Sixth Circuit has referred to plaintiffs' burden on this *prima facie* test as a "low hurdle." *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)). Pertinent here, for instance, "temporal proximity can demonstrate a causal connection for purposes of a *prima facie* case …." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) (*italics added*).

The Court finds in this case that the temporal proximity between Proffitt's use of the reasonable accommodation of leave and the District's actions toward non-renewal of her establishes a *prima facie* causal link between the two. Proffitt had been on medical leave for less than a month when Linson prepared an evaluation designed to justify non-renewal of Proffitt's contract. A reasonable jury taking Proffitt's version of events here could easily find that she cleared the "low hurdle" of proving a causal link between her use of leave and the onset of adverse

14

action taken against her. In short, the almost nonexistent temporal gap between these two actions gives way to the natural inference that the actions are directly related. Thus, Proffitt's claim of disability discrimination by way of retaliation survives summary judgment at the *prima facie* stage.

### 3. The District's Legitimate Nondiscriminatory Reasons and Pretext

The District addresses its burden of production under the *McDonnel Douglas* framework by essentially claiming that Proffitt's employment contract with the District was not renewed because of Proffitt's poor job performance. (Doc. No. 20 at PageID 833, 835.) As a rule, "[p]oor performance is a legitimate, nondiscriminatory reason for terminating a person's employment …." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008). Therefore, the District has articulated a legitimate, nondiscriminatory reason for the non-renewal of Proffitt's employment contract and met its burden of production under *McDonnell Douglas*.

The burden then shifts to Proffitt to prove this reason was mere pretext for discrimination. An employer's stated reasoning for taking adverse action will not amount to pretext for discrimination "unless it is shown that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 781 F.3d 274, 285 (6th Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (internal quotation marks omitted). Here, Proffitt does not argue that the District's proffered reasoning for the non-renewal of her employment contract was pretextual at all.

What's more, the Court finds insufficient evidence to determine that the District's reasoning was pretext for disability discrimination. At most, the Court is left with little more than Proffitt's testimony, alleging that her colleagues and superiors conspired to exclude her from meetings and withhold student data from her. Even assuming Proffitt faced such mistreatment, there is no independent evidence that Proffitt was otherwise performing well in her role as a

15

behavioral specialist. Rather, it appears from the record that the District was receiving complaints about Proffitt from faculty and parents alike regarding Proffitt's poor performance. (Doc. Nos. 15 at PageID 553-54; 17 at PageID 690-92, 694; 17-1 at PageID 725; 17-3 at PageID 729.) To illustrate, one parent emailed District officials specifically requesting that Proffitt be investigated based entirely on Proffitt's lack of expertise and professionalism in dealing with the parent's special needs child. (Doc. No. 17-3 at PageID 729-30.) Against evidence of this ilk, Proffitt's testimony amounts to no more than a mere scintilla of evidence supporting pretext. Accordingly, the Court finds that the District's stated reasoning for the non-renewal of Proffitt's employment contract was not pretext for discrimination and the District's Motion is **GRANTED** with respect to Proffitt's claims of disability discrimination.

IV. **CONCLUSION**

Based on the foregoing, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, the District's Motion for Summary Judgment (Doc. No. 20). Specifically, the Court **DENIES** the District's Motion on Proffitt's claim for FMLA interference. However, the Court **GRANTS** the District's Motion with respect to Proffitt's claims for disability discrimination under state and federal law (Counts II & III). Accordingly, Counts II and III of the Complaint are hereby **DISMISSED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, June 23, 2025.

                                                                      s/Thomas M. Rose
                                                      _____
                                                               THOMAS M. ROSE
                                           UNITED STATES DISTRICT JUDGE